**LOCAL 719, AMERICAN BAKERY AND CONFECTIONERY WORKERS OF AMERICA, AFL–CIO, Appellant,**

v.

**The NATIONAL BISCUIT COMPANY, a Corporation.**

No. 15969.

United States Court of Appeals Third Circuit.

Argued Feb. 9, 1967.

Decided June 2, 1967.

---

Caesar C. Guazzo, New York City (Parisi, Evers & Greenfield, Hackensack, N. J., on the brief), for appellant.

Morton M. Maneker, New York City (Proskauer, Rose, Goetz & Mendelsohn, New York City, O'Mara, Schumann, Davis & Hession, Jersey City, N. J., Howard Lichtenstein, Saul G. Kramer, Michael Hertzberg, New York City, James A. Hession, Jersey City, N. J., on the brief), for appellee.

Before BIGGS, HASTIE and FORMAN, Circuit Judges.

## OPINION OF THE COURT

FORMAN, Circuit Judge.

This is an appeal from an order of the United States District Court for the District of New Jersey granting the motion of the defendant below, National Biscuit Company ["Company"], for summary judgment against Local 719, American Bakery and Confectionery Workers of America, AFL–CIO ["Union"], dismissing the Union's action to declare void an arbitration award and granting the Company's counterclaim for confirmation of the award. This action was commenced by the Union in the Superior Court of New Jersey and removed to the District Court by reason of its jurisdiction under Section 301 of the Labor

Management Relations Act[1] and 28 U.S.C. § 1331 and § 1337.

The undisputed facts derived from the pleadings, exhibits appended thereto, and the stipulation of the parties as to the completeness and accuracy of the transcript of hearings and related exhibits before the arbitrator show that the Company maintains a commercial bakery in Fair Lawn, New Jersey where the Union represents the bakery's 1500 employees, of whom about 80 are engaged in the shipping department. In the summer of 1964, the Company informed the Union that it intended to implement certain quantitative standards (called "reasonable expectancies") governing the output of work in the shipping department, which were developed on the basis of a study conducted by an outside consultant working with representatives of management. The authority invoked for such action was Section 1 of Article 28 of the collective bargaining agreement, providing as follows:

"Section 1 The Management of the business of the Company, the direction of its working forces, the schedules and quantities of production and the methods, processes and means of manufacturing, are prerogatives of the Management.

"It is understood that no provisions of this paragraph shall in any way interfere with, or abrogate any rights conferred upon the Union or its members, by any other clause contained in this Agreement."

When the Union objected both to the standards and to the right of the Company to establish the same "unilaterally," the Company sought arbitration under Section 2 of Article 28 of the collective bargaining agreement, which provides:

"Section 2 In cases where changes in methods of manufacturing or increases in production are contemplated by the Management, the Company will submit such changes to the Business Representative and/or top official of the Local Union. Where the Union claims that any such change will result in more than a fair day's work for the employees involved, such change shall be submitted to a person designated by the top official of the parent body of the local union and to a person designated by the Management, in an effort to reach an agreement. Where both officials fail to reach an agreement, they shall choose a mutually satisfactory third (3rd) person as arbitrator of the dispute. His decision shall be final and binding on both parties."

The specific question submitted for arbitration was:

"Do the work schedules proposed by the company for the shipping department pursuant to Article 28 of the contract exceed a fair day's work for the time scheduled? If so, what schedules would be appropriate?"

Although the Union maintained that the dispute was inarbitrable, it consented to the designation of the arbitrator, who was selected from the roster of the Federal Mediation and Conciliation Service. At the first hearing before the arbitrator on the question of the arbitrability of the dispute, the Union agreed through its counsel "to appear before [him] with respect to the question of arbitrability," though not "in any sense to involve a waiver of any rights concerning arbitrability." After a hearing on this issue wherein the Union presented two witnesses, the arbitrator held that the dispute was within the contractual submission to arbitrate. Counsel for the Union expressed some fear at this time that if he thereafter participated on the merits of the dispute he would be deemed under the law to have prejudiced his rights to contest arbitrability. Nevertheless, four days of hearings on the merits were held with the Union participating, and thereafter the arbitrator rendered the award contested here, in which he held that some of the work expectancies did not exceed a "fair day's work"; that certain others were not supported by evidence adequate to permit decision; and that

---

1. 29 U.S.C. § 185(a).

another was excessive and therefore decreased.

## I—Waiver of Arbitrability

While the Union contests the arbitrability of the dispute, it is the position of the Company that this court need not reach that issue for two related reasons: (1) that the Union had agreed to submit the issue of arbitral jurisdiction to the arbitrator and is therefore bound by his determination; and (2) that by participating on the merits of the dispute after the arbitrator's decision in favor of arbitrability, the Union forfeited its right to contest arbitral jurisdiction in a judicial forum.

██ The existence and extent of an obligation to settle disputes through arbitration is a contractual matter subject to judicial determination,[2] and any claim that the parties intended to exclude the courts from consideration of arbitrability must be borne by "a clear demonstration of that purpose."[3] Clearly at the inception of the arbitral hearings the Union acquiesced in the arbitrator's jurisdiction to decide whether the dispute was within the contractual submission—essentially a jurisdictional question—but with equal clarity the Union stated that its participation did not indicate a willingness in fact to forfeit judicial review of arbitrability. This fact distinguishes the present situation from Metal Product Workers Union, Local 1645 v. Torrington Co.,[4] cited by the Company, where both

parties entered a written submission stating that a decision by the arbitrator that the matter is inarbitrable "will be issued as a final award," and the arbitrator so decided. Similarly, the Union's participation on the merits of the dispute cannot be held to constitute a willingness in fact to forfeit judicial consideration of arbitrability in light of the clear statement by its counsel at the opening of the hearing that, "We are proceeding in this case without recognizing the validity of your decision, Mr. Arbitrator, with respect to arbitrability."

██ Thus the Company's argument that the Union is now precluded from challenging arbitrability depends upon our adoption of a rule that would require a party disputing the issue to seek an injunction against arbitration before the proceedings commence, or to refrain from participating on that issue, or to seek court action immediately upon an arbitrator's affirmation of his own jurisdiction, at the penalty of waiver. No such procedure is required by statutory or decisional law, and in the few instances where a party has sought to impute a waiver of judicial jurisdiction in this manner, the argument has been found meritless.[5] In our own federal litigation system we require no special jurisdictional appearances[6] and permit no interlocutory appeals from a court's decision in favor of its jurisdiction.[7] Since federal labor policy with respect to arbitration favors the establishment of a

2. John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 547, 84 S.Ct. 909, 11 L.Ed. 2d 898 (1964); Atkinson v. Sinclair Refining Co., 370 U.S. 238, 241, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962); Retail Clerks Int'l Ass'n, Locals 128 and 633 v. Lion Dry Goods, Inc., 341 F.2d 715, 720 (6 Cir.), cert. denied 382 U.S. 839, 86 S.Ct. 87, 15 L.Ed.2d 81 (1965).

3. United Steel Workers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 583, n. 7, 80 S.Ct. 1347, 1353, 4 L. Ed.2d 1409 (1960).

4. 358 F.2d 103 (2 Cir. 1966).

5. E.g., District 50 United Mine Workers of America v. Pittston Co., 210 F.Supp.

781, 786 (N.D.W.Va.1962), cited on this point in Acme Markets, Inc. v. Retail Clerks Int'l Union, Local 1357, 235 F. Supp. 814, 815, n. 3 (E.D.Pa.1964), aff'd per curiam, 344 F.2d 330 (3 Cir. 1965). Contra, Collingswood Hosiery Mills, Inc. v. American Federation of Hosiery Workers, 28 N.J.Super. 605, 101 A.2d 372 (Ch.Div.1953), rev'd on other grounds, 31 N.J.Super. 466, 107 A.2d 43 (App.Div.1954).

6. Fed.R.Civ.P. 12(b).

7. Catlin v. United States, 324 U.S. 229, 236, 65 S.Ct. 631, 89 L.Ed. 911 (1945).

private juridical system,[8] there is even less reason to make resort to interstitial judicial activity mandatory, when the possibility exists that a labor dispute can be settled without any use of the courts whatsoever. Thus, where as here the reluctant party has presented its objection to arbitrability to the arbitrator and has not thereafter clearly indicated its willingness to forego judicial review, we believe that the issue is sufficiently preserved for our subsequent inquiry.

## II—Arbitrability

Article 28, Section 1 of the collective bargaining agreement, supra, designates as a prerogative of management the "direction of working forces, the schedule and quantities of production, and the methods, processes, and means of manufacturing." Section 2 states that where contemplated "changes in methods of manufacturing or increases in production" are challenged as exceeding a "fair day's work," the issue is to be resolved in final phase by submission to an arbitrator, whose decision "shall be final and binding." The Union's argument is that the phrase "increases in production" as used in Section 2, does not encompass increases in the output of the shipping department, and that "production" means only "manufacturing," although the latter term is used distinctly in this section. The Union would also have to contend, though it does not do so explicitly, that the Company's prerogative over "the schedules and quantities of production,"

gives it no control over the output of the shipping department.

The Union's argument has little appeal. Since the collective bargaining agreement covers all the employees of the Fair Lawn plant; since the Union has proffered no rationale for excluding this particular department from the arbitration and management-prerogative sections; and since the disputed word "production" can be comfortably applied to the output of any given department,[9] the Union's attempt to resist arbitrability is seen at best to be a weak semantic parry, entirely insufficient to overcome the presumption in favor of arbitrability mandated by Supreme Court decision:

" * * * An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." [10]

The Union argues that the bargaining history nevertheless shows that the parties intended to exclude this type of dispute from arbitration. This court, at least in proceedings prior to arbitration, has refused to review the bargaining history where the language of the labor contract read in light of the presumption of arbitrability favors arbitration.[11] Here, however, the history of the employment relationship, as developed before the arbitrator, comes as part of the factual record of this case. This history

8. "A collective bargaining agreement is an effort to erect a system of industrial self-government. * * * Arbitration is the means of solving the unforeseeable by molding a system of private law * * *." United Steelworkers of America v. American Manufacturing Co., 363 U.S. 564, 580–581, 80 S.Ct. 1343, 1352, 4 L.Ed.2d 1403 (1960); 29 C.F.R. § 1404.1 (1966).

9. In his final decision of April 16, 1965, the Arbitrator stated, "From the record, there is no question that the schedules proposed by the Company contemplate an increase in the *production* of the employees of the Shipping Department.

* * * The Company has submitted the change to the required Union officials. No agreement has been reached. Thus all the requirements of Article 28, Section 2 have been fulfilled." (Italics supplied.)

10. United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582–583, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); see L. O. Koven & Brother, Inc. v. Local Union No. 5767, United Steelworkers of America, 381 F.2d 196 (3 Cir. 1967).

11. Communications Workers of America v. Bell Telephone Laboratories, Inc., 349 F.2d 398 (3 Cir. 1965).

shows that when the Company opened its shipping branch at Fair Lawn, New Jersey, a supplemental agreement, dated February 28, 1958, was signed by the Company and the Union, which provided in part:

"1. In consideration of an adjustment [in wages] to all employees in the Shipping Branch, it was agreed that all past practices and oral agreements and understandings, in reference to the number of employees to be used in the loading and unloading operations, etc., would be discontinued at the new Shipping Branch at Fair Lawn, N. J.

"2. As operations are expanded at Fair Lawn, working conditions will be the subject of discussion and mutual agreement."

Thereafter, work schedules were set forth by the manager of the Fair Lawn Branch and agreed to by the Union on the basis of informal "understandings." Problems with shipping slowdowns began later in 1958, and since that time the output of the shipping department has been a matter of continual dispute. The evidence further showed that the parties had never agreed upon what constitutes a fair day's work; that when the Company expressed grievance at the failure of employees to complete a particular load, the Union would offer some justification for such failure, and the matter ordinarily ended without resolution; that at least one employee had been disciplined because of this type of grievance; and that while the Company had filed grievances under Article 28, it had never before invoked arbitration. The collective bargaining agreement at the time of these proceedings became effective on September 1, 1963, and contained the same or similar arbitration clause involved herein as its predecessor agreement.

■■ This evidence, far from compelling a conclusion that the disputed issue is inarbitrable, is consistent with an interpretation that work schedules were to be effectuated at an informal level; were subject to grievance procedures; and that resort to arbitration was the logical step for the Company, unable to reach a workable solution at an earlier stage. Rather than constituting bargaining history, the evidence is merely grievance history. As such it is obvious that the Union's proffer fails to meet the standard of forceful evidence of an unambiguous purpose to exclude the issue from arbitration.[12] There is no evidence of an abortive attempt by the Company to include work schedules as a subject of the arbitration provision.[13] Thus, our inquiry ceases, for this court has consistently rejected invitations to inquire into arbitrability, where such inquiry would be coextensive with a determination of the merits of a controversy.[14] Furthermore, insofar as the prior failure of the Company to seek arbitration may be characterized as a "waiver" or "estoppel," this is clearly a question of procedural arbitrability to be determined by the arbitrator,[15] and here decided against the Union by him.

12. United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 584–585, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1963); Communications Workers of America v. Pacific Northwest Bell Telephone Co., 337 F.2d 455, 459 (9 Cir. 1964); Acme Markets, Inc. v. Retail Clerks Int'l Union, Local 1357, 235 F.Supp. 814 (E.D.Pa. 1964), aff'd per curiam, 344 F.2d 330 (3 Cir. 1965).

13. See International Union of Electrical, Radio, and Machine Workers, AFL–CIO v. General Electric Co., 332 F.2d 485, 490 (2 Cir.), cert. denied, 379 U.S. 928, 85 S.Ct. 324, 13 L.Ed.2d 341 (1964).

14. E.g., General Warehousemen and Employees Union No. 636 v. American Hardware Supply Co., 329 F.2d 789 (3 Cir.), cert. denied, 379 U.S. 829, 85 S. Ct. 57, 13 L.Ed.2d 37 (1964); Association of Westinghouse Salaried Employees v. Westinghouse Electric Corp., 283 F.2d 93 (3 Cir. 1960).

15. See John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 555–558, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964); General Warehousemen and Employees Union No. 636 v. American Hardware Supply Co., 329 F.2d 789, 793 (3 Cir.), cert. denied, 379 U.S. 829, 85 S.Ct. 57, 13 L.Ed.2d 37 (1964).

*III—Enforcement of the Substantive Award*

The arbitrator's award dealt with the duties of the shipping department in three parts:

(1) As to the loading of trailers and motor trucks, the arbitrator held that the expectancies established by the Company did not exceed a fair day's work, except under an "extreme condition" involving a load of a certain number of "mixed unit hand trucks" and excluded this situation from the expectancies that were confirmed. In evaluating the evidence before him, the arbitrator stated:

"[T]hese data are based on the timings of observers relatively untrained to perform this function with precision and they are approximate in that ordinary clocks and watches were used. * * * Nevertheless * * * the timing of the various observers do show a high degree of internal consistency. Also, to a significant extent, possible errors are offset by the selection of well below the average items per hour as the reasonable expectancy. Standing alone, the Arbitrator would be disinclined to accept them as the final proof that the reasonable expectancies necessarily represent a fair day's work. But they do not stand alone."

The arbitrator then noted that the expectancies compared favorably with the performance of the night shift during a seven month period, including a period when college students were employed as temporary vacation replacements. A specific expectancy was assigned to each of four classes of products, into which the approximately 270 company products were divided according to size, weight, and product type. The arbitrator stated in this regard:

"[T]his decision does not imply the Arbitrator's approval of each product classification among the four classes. There is no reason to doubt the appropriateness of the four classes but the record does not supply the requisite information for the Arbitrator to judge the correctness of the classification into which each product has been placed. If there is reason to believe and evidence to support * * * [a] wrong classification, this would appear to be the proper subject of a grievance. * * * "

(2) As to the unloading of trailers and motor trucks, the arbitrator refused to rule on the expectancies proposed by the Company on grounds: (a) the timings for unloading were not so internally consistent as those for loading; (b) there was no corroborative evidence; and (c) it could not be assumed *a priori* that it took as long to unload a specific product as to load it.

(3) As to the assembling of mixed loads on hand trucks, the arbitrator, subjecting the Company's proof to a "beyond doubt" standard, ruled that the Company's proposed expectancy exceeded a "fair day's work," and therefore introduced "a further element of conservatism" by awarding a lowered schedule as a reasonable expectancy.

There is no evidence to support a claim that the Company unsuccessfully attempted to include these work standards as substantive provisions of the collective bargaining agreement.[16]

16. This is the general problem raised by Torrington Co. v. Metal Products Workers, Local 1645, 362 F.2d 677 (2 Cir. 1966), cited by the appellant, and Local 483, Int'l Brotherhood of Boilermakers, Iron Builders, Blacksmiths, Forgers and Helpers, AFL-CIO v. Shell Oil Co., 369 F.2d 526 (7 Cir. 1966). Two comments are appropriate: First, in distinguishing these cases we express neither agreement nor disagreement with the theories embodied therein. Second, the Ninth Circuit, in Shell Oil Co., supra, treats the inquiry posed by this distinction as relevant to arbitrability. However, by virtue of the cases cited in note 14, supra, proscribing entanglement in substantive determinations when considering arbitrability, this circuit is committed to consider such evidence only as a post-arbitration question of the scope of the arbitrator's authority, thereby giving effect to the therapeutic value of arbitration, see United Steelworkers of America v. Amer-

Rather, the bulk of the Union's challenge to the arbitrator's decision on the merits is comprised of allegations that the data supporting the work expectancies was inadequate and incompetent because the timings were crude, made by persons untrained in time study; because assertedly important factors affecting labor speed were not encompassed in the evidence; and because an insufficient variety of the Company's products were utilized in various aspects of the time study. These arguments were made to and considered by the arbitrator in reaching his award. It would be difficult to imagine an area of decision more clearly within the prohibition against judicial reevaluation of the merits of an arbitral award.[17]

Our decision in H. K. Porter Co., Inc. v. United Saw, File and Steel Products Workers of America, Fed. Labor Union, AFL–CIO,[18] contrary to the Union's contentions, does not permit a scope of review more extensive than that to which we presently confine ourselves. In that case the arbitrator awarded pension benefits to certain employees who were technically unqualified in light of explicit eligibility provisions in the labor contract, requiring the employee to have reached 65 years of age and to have rendered 25 years of service. The award to employees under 65 but with 25 years of service was found to be justified by past practice, but there was no evidence to support an award to employees with less than 25 years of service. Since the contractual submission confined the arbitrator to the "meaning and interpretation of this Agreement," and since the award to employees with less than 25 years of service was (1) in conflict with a provision of the agreement which was "clear and unambiguous" on its face, and (2) bereft of support from evidence of a contrary practice, we reasoned that the award must have been grounded *solely* in some ulterior and hence impermissible source.[19] Here, however, no provision of the labor contract defines a "fair day's work" so as to create a conflict with the arbitrator's award which might suggest an assumption of power by the arbitrator not delegated by the parties. Furthermore, it should be noted that with regard to that part of the award that was supportable by past practice, we made no inquiry into the quality or persuasiveness of the evidence as we are here urged to do by the Union.

██ Only three contentions of the Union remain for examination. First, the Union seeks to impute misconduct and prejudgment to the arbitrator as a ground for vacating the award on the basis of a statement in his decision that the Union presented no witnesses. In fact, the Union presented only two witnesses at the "preliminary hearing" on arbitrability and none at the hearing on the merits, and it is clear beyond doubt that the arbitrator's statement was made in this latter regard.

██ Second, the Union urges that because the arbitrator allowed for the possibility of future adjustment on the precise classification of the Company's products into one of the four categories, the award is indefinite, unmanageable, and "lacks finality." It further suggests that we draw by analogy on 9 U.S.C. § 10(d) providing for the vacation of an arbitrator's award where it is so "imperfectly executed" that a "mutual, final

ican Mfg. Co., 363 U.S. 564, 568, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960), whether or not we ultimately choose to enforce the award. Compare notes 13 and 14, supra, and accompanying text.

17. United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 568, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers of America v. Enterprise Wheel & Car Co., 363 U.S. 593, 596–598, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

18. 333 F.2d 596 (3 Cir. 1964).

19. 333 F.2d at 602. See United Steelworkers of America v. Enterprise Wheel & Car Co., 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960), "[A]n arbitrator is confined to the interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice."

and definite award upon the subject matter submitted was not made." Without pursuing the availability or extent of such an analogy in our review of labor arbitration awards, we concede the possibility of refusing judicial enforcement of an award whose content and effect is unclear, but we find no such difficulty here. The arbitrator obviously viewed the classifications as utile but challengeable by the Union on a case-by-case basis, for example, as a defense to a grievance or disciplinary action by the Company by reason of an unsatisfied expectancy, or by direct Union grievance that the handling of the product at the rate prescribed by its classification produced an unfair burden on the labor force. We do not think an award unmanageable because it permits of subsequent defenses to its enforcement at the arbitral level or flexibility in its future application. Clearly the benefit of this qualification of the award inures to the Union and was well within the arbitrator's remedial powers.

Finally, the Union points to an apparent inconsistency on the face of the arbitrator's decision, wherein the expectancy designated by the arbitrator for Class 2 products is 15 "full unit hand trucks" per hour, while at another point in the decision where an illustration of how the expectancies were calculated is set forth, it is indicated that the expectancy of Class 2 products is only 12 per hour. Ordinarily, ambiguities and inconsistencies in the award should be resolved by resubmission to the arbitrator.[20] The Company apparently pursued this course informally by correspondence with the arbitrator. At the hearing on the motion for summary judgment, however, the Union refused to stipulate to the authenticity of the arbitrator's reply letter. We are convinced, however, that a vacation of the order below for this limited purpose is not necessary here, for we agree with the Company on the basis of comparing the text of the arbitrator's opinion with the timings of Class 2 and Class 3 products that the error is merely typographical; that the expectancy for Class 2 products is 15 per hour; and that the example in the text of the arbitrator's decision relating an expectancy of 12 per hour was in reference to Class 3 products.

Hence the order of the United States District Court for the District of New Jersey of April 6, 1966 dismissing the complaint of the Union and granting the Company's counterclaim confirming the award, dated April 16, 1965, of S. Herbert Unterberger as Arbitrator, will be affirmed.

20. Hanford Atomic Metal Trades Council, AFL-CIO and C.L. v. General Electric Co., 353 F.2d 302, 307–308 (9 Cir. 1966); United Steelworkers of America, AFL-CIO v. Timken Roller Bearing Co., 324 F.2d 738 (6 Cir. 1963); International Ass'n of Machinists, AFL-CIO v. Crown Cork and Seal Company, 300 F.2d 127 (3 Cir. 1962).