**ASIA NORTH AMERICA EASTBOUND RATE AGREEMENT, Petitioner,**

v.

**BJI INDUSTRIES, INC., Respondent.**

Civ. A. No. 94–903 SSH.

United States District Court, District of Columbia.

Aug. 28, 1995.

508

Cindy G. Buys, Jeffrey F. Lawrence, Anne E. Mickey, Sher & Blackwell, Washington, DC, for Petitioner.

Daniel E. Johnson, Gary H. Sampliner, McKenna & Cuneo, Washington, DC, for Respondent.

## OPINION

STANLEY S. HARRIS, District Judge.

This matter is before the Court on petitioner's petition to confirm the arbitral award, petitioner's motion for default judgment, respondent's counter-motion to set aside entry of default, petitioner's renewed motion to confirm arbitral award, and respondent's motion to dismiss. Upon consideration of the entire record, the Court grants respondent's motion to set aside entry of default, grants petitioner's petition to confirm the arbitral award, and denies the remaining motions.

### Background

In this action to confirm an arbitral award, petitioner Asia North America Eastbound Rate Agreement ("ANERA") seeks to collect liquidated damages from respondent BJI Industries, Inc. ("BJI"), for a shortfall in the quantity of goods that were to be shipped for BJI during the period March 24, 1987, to March 23, 1988.[1] ANERA is a Hong Kong based conference of ocean common carriers established pursuant to the Shipping Act of 1984, 46 U.S.C.App. §§ 1701 *et seq.* ("the Act").

In March of 1987, ANERA allegedly entered into Service Contract No. 262/87 ("the Service Contract") with BJI, a Texas corporation.[2] The Service Contract was allegedly

---

**1.** According to the Texas Secretary of State, Braxton Jeans, Inc., changed its name to BJI Industries, Inc., on February 4, 1991.

**2.** "Service contract" is defined in the Act as "a contract between a shipper and an ocean com-

mon carrier or conference in which the shipper makes a commitment to provide a certain minimum quantity of cargo over a fixed time period, and the ocean common carrier or conference commits to a certain rate or rate schedule as well as a defined service level...; the contract may

signed on BJI's behalf by Eric Ko, an employee of TRC Textile Co., Ltd. ("TRC"), a Taiwanese company. TRC serves as an overseas buying agent that has the authority to find carriers and negotiate shipping rates for BJI. Under the Service Contract, BJI agreed to ship and ANERA agreed to carry a minimum of 150 forty-foot equivalent container units ("FEUs") of garments from ports in the Far East to several ports or points in the United States during the period from March 24, 1987, to March 23, 1988. The Service Contract further provided that if BJI failed to ship the minimum quantity of cargo, then BJI would pay liquidated damages (known as "deadfreight") in the amount of $2,450.00 per FEU.

On March 23, 1988, when the Service Contract expired, BJI had shipped only 127.605 FEUs; thus, there was a shortfall of 22.395 FEUs. In October of 1989, ANERA notified BJI that it owed ANERA $54,867.75 in deadfreight liability.[3] In December of 1989 and February of 1990, counsel for BJI claimed that TRC was never authorized to bind BJI to any contract, and therefore, that no valid contract existed between ANERA and BJI. On March 18, 1993, ANERA demanded arbitration pursuant to Article 17(a) of the Service Contract, and on March 26, 1993, BJI notified ANERA of its refusal to submit to arbitration.[4] On June 1, 1993, the Hong Kong International Arbitration Centre ("HKIAC") appointed Robin S. Peard as arbitrator. The following day, counsel for BJI wrote to the HKIAC disputing the validity of the arbitration and the appointment of an arbitrator. Included in this correspondence was a sworn statement, taken in September of 1992, in which BJI's president stated that

TRC was not authorized to sign the Service Contract on BJI's behalf. BJI did not file further submissions thereafter.

In order to determine the validity of the arbitration agreement, the arbitrator considered whether TRC had authority to sign the Service Contract on behalf of BJI, and determined that it did. On February 28, 1994, the arbitrator awarded ANERA $94,388.01, which BJI did not pay.[5] On April 22, 1994, ANERA filed the petition to confirm the arbitral award against BJI in this court. On June 28, 1994, the Clerk of the Court entered a default against BJI. ANERA now renews its efforts to collect the liquidated damages.

*Discussion*

*I. Default*

A court may set aside an entry of default if good cause exists. Fed.R.Civ.P. 55(c). Although a decision to set aside an entry of default lies within the discretion of the trial court, the "exercise of that discretion entails consideration of whether (1) the default was willful, (2) a set-aside would prejudice the plaintiff, and (3) the alleged defense was meritorious." *Keegel v. Key West & Caribbean Trading Co.,* 627 F.2d 372, 373 (D.C.Cir.1980) (citations omitted); *accord Jackson v. Beech,* 636 F.2d 831, 837–38 (D.C.Cir.1980). Moreover, judgment by default is normally reserved for a "totally unresponsive party" because a resolution on the merits is preferable to a judgment by default. *Jackson,* 636 F.2d at 836; *Pulliam v. Pulliam,* 478 F.2d 935, 936 (D.C.Cir.1973); *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe,* 432 F.2d 689, 691 (D.C.Cir.1970). In the present case, once the three factors of

---

also specify provisions in the event of nonperformance on the part of either party." 46 U.S.C. app. § 1702(21).

3. The deadfreight liability was calculated as follows:

| Minimum Quantity Commitment: | 150.000 FEUs |
|---|---|
| − Quantity Shipped: | 127.605 FEUs |
| = Deadfreight | 22.395 FEUs. |

At a rate of $2,450.00 per FEU—$2,450.00 × 22.395—the total deadfreight liability equals $54,867.75.

4. Article 17(a) states "[a]ny and all disputes arising out of or in connection with this Contract, including any failure by the Shipper to pay or by the Agreement to perform as required hereunder, shall be resolved by arbitration in Hong Kong, or such other place as the parties to the dispute may mutually agree."

5. This amount consists of $54,867.75 for deadfreight liability (*supra* note 3), $23,405.31 for interest thereon, $14,292.32 for ANERA's costs, and $1,822.63 for the arbitrator's fee.

willfulness, prejudice, and the presence of a meritorious defense are weighed, it becomes clear that a default judgment should not be entered against BJI.

### A. Willfulness

 BJI contends that it did not receive the Clerk's notice of entry of default or AN-ERA's motion for default judgment until after BJI's counsel discovered on August 11, 1994, that these documents were on file with the Court. BJI further contends that its initial failure to participate in this Court's proceedings was due to its good faith belief that it was not a party to the Service Contract. ANERA, however, argues that BJI has been unresponsive throughout this action by refusing to participate in the arbitration proceeding, and by not filing any motion or answer with the Court in response to the petition to confirm the arbitral award. In deciding whether to set aside a default or default judgment, the record must be construed in the light most favorable to the moving party. *Jackson,* 636 F.2d at 836. Applying this standard of review, the Court finds that BJI's conduct does not rise to the level of "willful" behavior contemplated by *Keegel. See Keegel,* 627 F.2d at 374.

ANERA also argues that because the arbitrator had determined that BJI was bound by the Service Contract, including the agreement to arbitrate, BJI could not in good faith remain unresponsive to the petition to confirm the arbitral award. The Court disagrees. It is established that the courts, not arbitrators, must decide whether the parties before them had a valid agreement to arbitrate the dispute in question. *AT & T Technologies, Inc. v. Communications Workers of America,* 475 U.S. 643, 647–49, 106 S.Ct. 1415, 1418–19, 89 L.Ed.2d 648 (1986); *National R.R. Passenger Corp. v. Boston & Maine Corp.,* 850 F.2d 756, 759 (D.C.Cir. 1988); *Weatherly Cellaphonics Partners v. Hueber,* 726 F.Supp. 319, 321 (D.D.C.1989). Thus, the arbitrator's conclusions concerning the validity of the Service Contract are not binding. Moreover, counsel for BJI moved to set aside the entry of default on August 25, 1994, approximately four months after the petition to confirm the arbitral award was filed. Despite its somewhat tardy appearance, BJI cannot be considered a "totally unresponsive party." *See Jackson,* 636 F.2d at 836. As a result, the willfulness factor weighs heavily against an entry of a default judgment.

### B. Prejudice to the Petitioner

 ANERA contends that setting aside the default will cause it to suffer prejudice by delaying the entry of relief and an award of attorneys' fees in its favor. However, the delay of satisfaction of a prevailing plaintiff's claim is insufficient to establish prejudice. *Keegel,* 627 F.2d at 374. As a result, this factor weighs in favor of BJI.

### C. Meritorious Defense

 In determining the existence of a meritorious defense, likelihood of success is not the measure. *Id.* A respondent's allegations are meritorious if they contain "even a hint of a suggestion" which, if proven, would constitute a complete defense. *Id.* (citations omitted). Even broad and conclusory allegations meet the meritorious defense criterion for setting aside the default. *Id.* In the present case, because BJI elected not to submit to arbitration, the arbitrator was not presented with the alleged facts and evidence now before this Court. BJI contends that it has defenses available to it under Article II and Article V of the U.N. Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("the Convention").[6] 9 U.S.C.A. note § 201. BJI further contends that ANERA had a history of contracting directly with TRC for BJI's shipments, and that it never received a copy of the Service Contract or correspondence relating to it until after the contract had expired. Therefore, BJI's defense on the issue of the validity of the arbitral award satisfies the "hint of a suggestion" standard, even if BJI eventually loses on the merits. Taken together, the

---

**6.** Specifically, BJI asserts that the courts are precluded from enforcing foreign arbitral awards without a valid written agreement to arbitrate between the parties, and that the arbitrability question constitutes "... a difference not contemplated by or not falling within the terms of the submission to arbitration." 9 U.S.C.A. note § 201.

balance of considerations weighs against an entry of judgment by default. Accordingly, the motion to set aside the entry of default is granted.

### II. Jurisdiction

■ Before addressing the merits of the confirmation action, the Court must determine whether personal jurisdiction is proper in this Court. Contractual provisions relating to jurisdiction will be honored as long as they are reasonable. *See National Equip. Rental, Ltd. v. Szukhent,* 375 U.S. 311, 315, 84 S.Ct. 411, 414, 11 L.Ed.2d 354 (1964). ANERA asserts that under Article 17(b) of the Service Contract, BJI expressly consented to an exercise of personal jurisdiction by the District Court for the District of Columbia in any action to enforce an arbitral decision.[7] BJI has not challenged the reasonableness of the jurisdiction clause, but rather moves to dismiss pursuant to Fed.R.Civ.P. 12(b)(2) on the ground that the clause is invalid because BJI is not a party to the Service Contract. As will be demonstrated, BJI is a party to the Service Contract; thus, the parties' consent to the jurisdiction of this Court is valid. Accordingly, respondent's motion to dismiss is denied.

### III. Validity of the Contract

ANERA moves to confirm the arbitral award on the grounds that: (1) the arbitrator's decision that BJI was a party to the Service Contract is entitled to preclusive effect; (2) BJI ratified the Service Contract by shipping under it and receiving benefits; and (3) TRC had apparent authority to sign the Service Contract on BJI's behalf.

#### A. Standard of Review

■ There is a strong federal policy favoring arbitration as an alternative to the "complications of litigation." *Davis v. Chevy Chase Fin.,* 667 F.2d 160, 164 (D.C.Cir.1981) (quoting *Wilko v. Swan,* 346 U.S. 427, 430, 74 S.Ct. 182, 184, 98 L.Ed. 168 (1953)). As a result, judicial review of an arbitration award

is extremely limited, *Kanuth v. Prescott, Ball & Turben,* 949 F.2d 1175, 1178 (D.C.Cir. 1991), and great deference is appropriate. ANERA argues that the award must be affirmed unless one of the specified grounds for refusing to recognize or enforce a foreign arbitral award exists. 9 U.S.C.A. note § 201. However, Article II of the Convention states that the arbitral agreement is to be in writing and signed by the parties or contained in an exchange of letters or telegrams. *Id.* Because the issue before the Court is whether the Service Contract validly was signed, the Court is precluded from enforcing the award until it makes this determination as a matter of law. Thus, the standard governing summary judgment applies here. *Cf. Davis,* 667 F.2d at 160 (applying summary judgment standard in an action to vacate an arbitration award where the arbitrability of a particular issue was disputed).

■ Summary judgment may be granted only if the pleadings and evidence "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering a summary judgment motion, all evidence and the inferences to be drawn from it must be considered in a light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Summary judgment cannot be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

#### B. Preclusive Effect of Arbitrator's Decision

■ As discussed *supra,* it is well-settled that only a court may determine with finality whether parties have entered into a valid agreement to arbitrate. *See AT & T Technologies,* 475 U.S. at 647–49, 106 S.Ct. at 1418–19; *National R.R. Passenger Corp.,* 850 F.2d at 759; *Weatherly Cellaphonics,*

---

7. Article 17(b) states "[t]he parties hereto expressly consent and agree that the United States District Court for the District of Columbia has personal jurisdiction over each of them in any action to enforce an arbitration decision entered hereunder, concurrently with any other court having jurisdiction."

726 F.Supp. at 321. ANERA argues, however, that BJI was obligated to file a motion to stay the arbitration before the proceedings took place, and that BJI's failure to file such a motion acts as a waiver to any defense in a confirmation action. This argument is unpersuasive. There is no procedure under statutory or decisional law that requires a party challenging arbitrability to seek an injunction before the arbitration commences, or suffer the penalty of a waiver.[8] *Local 719, American Bakery & Confectionery Workers of America v. National Biscuit Co.*, 378 F.2d 918, 921 (3d Cir.1967). Furthermore, the federal litigation system does not require special jurisdictional appearances. Fed. R.Civ.P. 12(b). Thus, BJI has not waived its right to contest arbitral jurisdiction in a judicial forum.

ANERA further contends that BJI submitted to arbitration by providing HKIAC with a sworn statement from BJI's president, and therefore has already litigated the merits of the arbitrability dispute. Even if the party contesting arbitration participates in the proceedings, it can preserve the arbitrability issue for judicial consideration by presenting "its objection to arbitrability to the arbitrator and ... not thereafter clearly indicate its willingness to forego judicial review." *Davis*, 667 F.2d at 167–68 (quoting *Local 719*, 378 F.2d at 922).

Here, ANERA received a letter from BJI's counsel on March 26, 1993, stating that "[w]e can not submit to arbitration ... we will defend our interests in court." On June 2, 1993, after an arbitrator had been appointed, counsel for BJI wrote to HKIAC stating "[m]y client has requested I inform all parties they are not agreeing to submit to arbitration as they have not entered into any agreement which binds them." A copy of that letter was forwarded to the arbitrator. Coupled with BJI's lack of participation in the arbitration proceedings thereafter, these statements demonstrate that BJI did not submit the arbitrability question to the arbitrator, or at least made an objection to the arbitrator's jurisdiction without a subsequent indication that it was willing to forego judicial inquiry. Even if the arbitrability issue has been litigated on the merits, as ANERA argues, the Court must make an independent determination of whether there was a valid agreement to arbitrate in any subsequent action to confirm the arbitrator's decision. *See Mobil Oil v. Local 8–766, Oil, Chem. & Atomic Workers Int'l Union*, 600 F.2d 322 (1st Cir.1979). Accordingly, the Court proceeds to the merits of the ratification issue.

### C. Ratification

The Service Contract provides that Hong Kong law shall govern the contract. "Under American law, contractual choice-of-law provisions are usually honored." *Milanovich v. Costa Crociere, S.p.A.*, 954 F.2d 763, 767 (D.C.Cir.1992). However, because the validity of the Service Contract is the central issue in this case, BJI has argued that Texas law should apply because BJI was doing business in Texas. Because ANERA believes the result will be the same in either jurisdiction, the Court applies Texas law in resolving this matter.

ANERA contends that BJI ratified the Service Contract by shipping under it and paying the freight, thereby receiving the benefits of the contract's lower rates. "The key concern in determining whether a principal has ratified an unauthorized act by an agent is the principal's knowledge of the act and subsequent actions with that knowledge."[9] *Wyatt v. McGregor*, 855 S.W.2d 5, 13 (Tex.Ct.App.1993) (citing *Land Title Co. of Dallas v. F.M. Stigler, Inc.*, 609 S.W.2d 754, 756 (Tex.1980)). Ratification can be ex-

---

8. Moreover, the federal policy favoring voluntary commercial arbitration, *see* Federal Arbitration Act, 9 U.S.C. §§ 1–15, would be undermined by making "interstitial judicial activity mandatory, when the possibility exists that a ... dispute can be settled without any use of the courts...." *Local 719*, 378 F.2d at 921–22; *see also Davis*, 667 F.2d at 168 (noting that a rule requiring parties disputing arbitrability to seek interlocutory review might foster litigation).

9. Because the parties dispute whether TRC had the authority to sign the Service Contract on behalf of BJI, the Court will view this issue in the light most favorable to the respondent, and assume *arguendo* that TRC was not authorized to enter into the Service Contract on BJI's behalf.

pressed or implied. *Id.* (citation omitted). It can occur when the principal retains the benefits of a transaction after acquiring full knowledge of the agent's unauthorized act. *Id.* (citing *Land Title,* 609 S.W.2d at 756); *Methodist Hosps. of Dallas v. Corporate Communicators, Inc.,* 806 S.W.2d 879, 882 (Tex.Ct.App.1991) (citing *Land Title,* 609 S.W.2d at 756). One who asserts ratification must prove that the ratifying party acted upon full knowledge of all material facts. *Land Title Co.,* 609 S.W.2d at 756–57.

■ BJI argues that it did not have full knowledge of the material facts relating to the Service Contract, and therefore, it could not have ratified the contract. In support of this argument, BJI claims that it did not know that TRC had signed BJI's name as the contracting party. The Court finds this argument unpersuasive. As discussed *supra,* the moving party need only show that the principal had knowledge of the material facts. Here, BJI admits that TRC was its agent for the purpose of arranging shipment of goods including the fixing of freight rates. BJI also acknowledges that it knew of multiple contracts in which TRC represented that BJI and TRC were affiliated and in which TRC signed on behalf of BJI.

More importantly, BJI admits that it received a copy of the first version of the Service Contract in which BJI was listed as an affiliate, and TRC represented that it was authorized to sign on behalf of BJI.[10] Under that contract, BJI also would have been entitled to ship cargo at the contract rates and would have been liable for deadfreight. Article 9 of the first version of the Service Contract unambiguously provides that:

10. Article 1 of the Service Contract states: "The term 'Shipper' means the entity signing this Contract and affiliates/subsidiaries named on the signature page hereof. The person signing this Contract on behalf of the Shipper warrants and represents that he has authority to enter into this Contract on behalf of the Shipper and its affiliates/subsidiaries listed on the signature page."

11. BJI asserts that it did not perform any unequivocal acts to indicate that it considered itself to be a party to the Service Contract. However, because BJI would have been liable for deadfr-

[I]n lieu of all damages, which are difficult to calculate, deadfreight shall be assessed as follows:
(i) If the "Shipper" [defined *supra* note 12 as the contract signatory and its affiliates] fails to tender the Minimum Quantity Commitment specified in Appendix A to this Contract, the Agreement [ANERA] shall invoice the Shipper and the Shipper agrees to pay deficit charges on the difference between the quantity of cargo actually shipped and the Minimum Quantity Commitment at the lowest 40' rate, specified in Appendix A [$2,450.00].

*See* Exhibit 8 to Respondent's Opposition to Petitioner's Renewed Motion To Confirm Arbitral Award. Thus, under the draft version of the Service Contract which BJI believed to be in effect, BJI would have been jointly and severally liable with TRC for liquidated damages for any shortfall. Because BJI's rights and obligations, including deadfreight liability, would have been the same under both the draft version of the contract and the final contract, and BJI had actual knowledge of the deadfreight provision in the draft version, BJI had knowledge of the material facts of the Service Contract.[11] *Cf. Karl Rove & Co. v. Thornburgh* 39 F.3d 1273, 1293 (5th Cir.1994) (principal found to have ratified contract where it knew of the substance of the contract if not the details).

■ Finally, BJI contends it did not know it was receiving benefits from the Service Contract; specifically, BJI claims it did not know how the shipping rates it paid under service contracts with ANERA compared to the prevailing tariff rates. However, "the knowledge to support ratification may be shown by evidence either of knowledge or facts from which such knowledge may reasonably be imputed to the principal." *Wyatt,* 855 S.W.2d at 13 (citations omitted).[12]

eight under both versions of the contract, its acceptance and payment for shipments under the Service Contract are unequivocal acts not subject to other interpretations.

12. BJI cites an 1863 Texas Supreme Court case to support the proposition that ratification requires actual knowledge of the material facts. *See Reese v. Medlock,* 27 Tex. 120, 124 (Tex. 1863). Although the case vaguely refers to this rule of law, the recent *Wyatt* decision demonstrates that knowledge can be inferred from cir-

ANERA is a Hong Kong based conference of ocean common carriers that offers bulk rates to shippers in exchange for high volume commitments. The record shows that BJI is in the business of importing goods and has a history of prior dealings with ANERA. Moreover, under the Service Contract, more than one hundred bills of lading containing specific references to "ANERA Service Contract No. 262/87" or "ANERA Service Contract E.T. No. 262/87" were received by BJI.[13] These bills of lading also showed BJI, its affiliate Cashe Braxton, and TRC as the consignee or notify party, and the bills were paid by BJI or Cashe Braxton. Taken together, these facts demonstrate that BJI knew, or in the exercise of reasonable observation, should have known, that it was benefiting from the Service Contract. Thus, even when viewed in the light most favorable to BJI, ratification is inferred from BJI's actions in shipping under the Service Contract and receiving the benefit of its more favorable rates.[14] Accordingly, ANERA's petition to confirm the arbitral award is granted in the amount of $94,388.01, plus interest from the date of the arbitral award to the date of the entry of judgment.[15]

## Conclusion

For the reasons stated above, the Court denies ANERA's motion for default judgment, grants BJI's motion to set aside entry of default, and denies BJI's motion to dismiss. The Court finds that there is no genuine issue of material fact in dispute and that ANERA is entitled to judgment as a matter of law, and, accordingly, grants ANERA's petition to confirm the arbitral award. An appropriate Order accompanies this Opinion.

cumstances as well. *See Wyatt*, 855 S.W.2d at 13.

13. Other references include "ANERA S/C No. 262/87," "Service Contract No. 262/87," or "ANA87262."

14. In view of the finding of implied ratification, the Court does not reach the issue of apparent authority.

15. Under Hong Kong law, interest is to accrue on an arbitral award until it is paid: "A sum directed to be paid by an award shall, unless the

*ORDER*

For the reasons stated in the accompanying Opinion, it hereby is

ORDERED, that petitioner's motion for default judgment is denied. It hereby further is

ORDERED, that respondent's motion to set aside the entry of default is granted. It hereby further is

ORDERED, that respondent's motion to dismiss is denied. It hereby further is

ORDERED, that petitioner's petition to confirm the arbitral award is granted, and that judgment is entered for the petitioner in the amount of $94,388.01. It hereby further is

ORDERED, that, within 14 days of the date of this Order, the parties shall submit supplemental briefs on the appropriate interest rate (unless agreement can be reached on this question).

SO ORDERED.

award otherwise directs, carry interest as from the date of the award and at the same rate as a judgment debt." Hong Kong Arbitration Ordinance, Chapter 341, Section 22. ANERA asserts that the applicable rate is the 7¾% prime rate published in the Wall Street Journal on September 7, 1994. However, because the rate of interest on a "judgment debt" is not clear, the Court will need additional briefs from the parties to resolve this issue (unless, of course, the parties are able to reach agreement on the narrow—and sole remaining—question).